# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KIPLEY ROYDON MARKS, | ) | Case No. 1:24-cv-2145 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jonathan D. Greenberg |
| PNC BANK, N.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Kipley Roydon Marks, a New Zealand citizen, allegedly lost funds through a business email compromise scam when, at the request of the scammers, he transferred $1 million from the Bank of New Zealand to purchase stock in a company as an investment.  Plaintiff brings a State-law claim against both Citibank and PNC Bank and claims against PNC Bank for negligence and conversion.  Defendants Citibank and PNC Bank separately move to dismiss.  For the following reasons, the Court **GRANTS** Defendant PNC Bank's motion and **DENIES** Defendant Citibank's motion.

## STATEMENT OF FACTS

Taking the alleged facts in the complaint as true and construing them in Plaintiff's favor, as the Court must on the motions before it, Plaintiff bases his claims on the following events.

### A.     The Business Email Compromise Scam

In 2022, Mr. Marks met in person with executives from Nyriad Inc., a California technology company.  (ECF No. 1, ¶ 12, PageID #4.)  After that meeting, Mr. Marks intended to invest in the company by purchasing shares.  (*Id.*)  On December 9, 2022, he received an email from the Nyriad's chief financial officer with wire instructions for the shareholder offering set to occur the following week.  (*Id.*, ¶ 13, PageID #5.)  Three days later, someone posing as the Nyriad CFO used a spoofed email address to contact Mr. Marks and send "updated" wire instructions for the shareholder offering.  (*Id.*, ¶ 14.)  These new instructions told Mr. Marks to wire money to a PNC Bank account purportedly in Nyriad's name and at its legitimate address.  (*Id.*)

On December 15, 2022, Mr. Marks instructed the Bank of New Zealand "to wire $1,000,000 in US Dollars to PNC for beneficiary Nyriad Inc., at its legitimate address," including a memo reading, "Remittance information:  Series B Preferred Stock Purchase."  (*Id.*, ¶ 15.)  That same day, the Bank of New Zealand wired the money to Citibank, its U.S. wire transfer partner, with a message containing the same information that Mr. Marks provided to BNZ.  (*Id.*, ¶ 17, PageID #5–6.)  In turn, Citibank wired the money to PNC Bank, which deposited the money into the imposter's account.  (*Id.*, ¶¶ 18 & 45, PageID #6 & #13.)  In doing so, Citibank provided PNC Bank with the beneficiary's name, address, account number, and the memo.  (*Id.*, ¶ 18, PageID #6.)

2

### B.     The PNC Bank Account

Sometime before December 15, 2022, an imposter shell company that did not belong to Nyriad opened the account that received the wire from Mr. Marks. (*Id.*, ¶¶ 19 & 24–28, PageID #6 & #8–9.) An imposter opened the account in Lake County, Ohio. (*Id.*) Federal law requires financial institutions, including PNC Bank, to follow Know Your Customer guidelines and a written customer identification program when accepting wire transfers. (*Id.*, ¶¶ 21 & 38, PageID #7 & #11.) PNC Bank's customer identification program requires businesses to provide "personal identity and corporate documents . . . when opening a business account" and to verify the documents through various processes. (*Id.*, ¶¶ 22 & 23, PageID #7 & #8.) These procedures allow PNC Bank to "automatically detect[] . . . when a business account's transactions do not match the anticipated type and dollar amount of the expected transactions for that account." (*Id.*, ¶ 32, PageID #10.) Despite having these programs in place, the imposter account was opened and allowed to receive the wire from Mr. Marks. (*Id.*, ¶¶ 29–30, PageID #9.) And despite PNC Bank receiving automatic fraud detection alerts related to the account, it remained open. (*Id.*, ¶¶ 33–43, PageID #10–12.)

### C.     Discovery of the Fraud

In January 2023, Mr. Marks and executives at Nyriad discovered the fraud. (*Id.*, ¶ 50, PageID #14.) Mr. Marks reported the fraud to the Bank of New Zealand, PNC Bank, the New Zealand police, and the Federal Bureau of Investigation. (*Id.*) On January 23, 2023, the Bank of New Zealand sent two messages to Citibank. (*Id.*, ¶¶ 51–52, PageID #14.) The first stated, "'Urgent recall—Fraudulent payment'" and

requested cancellation of the wire transfer.  (*Id.*, ¶ 51.)  The second confirmed that the transaction was fraudulent and "that Citi[bank] would issue a 'Recovery Request' directly to PNC to recover the amount of the fraudulent wire transfer."  (*Id.*, ¶¶ 51–52.)  That same day, the Bank of New Zealand reported the fraud to PNC Bank and, at the direction of Citibank, sent an indemnity of $1 million to Citibank in exchange for its release of recovered funds from PNC Bank.  (*Id.*)

On February 14, 2023, Citibank informed the Bank of New Zealand that PNC Bank had not responded to Citibank's request.  (*Id.*, ¶ 54, PageID #14.)  Additionally, Citibank suggested that Mr. Marks and the imposter "'settle this matter directly.'"  (*Id.*)  On April 20, 2023, after multiple requests for updates from the Bank of New Zealand, Citibank responded that PNC Bank still had not responded to its request to recover the funds and repeated its earlier suggestion of settling the matter directly.  (*Id.*, ¶ 55.)

By at least July 2023, federal law enforcement agents allegedly approached PNC Bank "regarding the fraudulent transaction involving [Mr. Marks's] funds."  (*Id.*, ¶ 56, PageID #15.)  Nevertheless, PNC Bank permitted withdrawal of "all but $242,812.85 of the funds" from the imposter's account.  (*Id.*, ¶ 57, PageID #15.)

In April 2024, a federal grand jury in Florida indicted four defendants with wire fraud and money laundering.  (*Id.*, ¶ 59, PageID #15.)  Mr. Marks is one of the identified victims.  (*Id.*)  In May 2024, PNC Bank transferred the $242,812.85 to the Bank of New Zealand, which returned the money to Mr. Marks.  (*Id.*, ¶ 60, PageID #15.)  But PNC provided no accounting or interest.  (*Id.*)

4

## STATEMENT OF THE CASE

On December 10, 2024, Plaintiff sued PNC Bank and Citibank in federal court for violating Section 1304.62 of the Ohio Revised Code.  Additionally, he sued PNC Bank for negligence and conversion.  PNC Bank and Citibank each moved to dismiss for failure to state a claim.  (ECF No. 10; ECF No. 17).

## ANALYSIS

In any civil action, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim.  *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. American Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)).  A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability."  *Twombly*, 550 U.S. at 555, 557 n.5.

When analyzing a complaint under this standard, the Court construes factual allegations in the light most favorable to the plaintiff, accepts them as true, and draws all reasonable inferences in the plaintiff's favor.  *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015).  But a pleading must offer more than mere "labels and conclusions," because "a formulaic recitation of the elements of a cause of action

will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading as factual allegations[.]"  *Eidson v. Tennessee Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

Therefore, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not be.  *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up); *see also, e.g.*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (determining that because some of the plaintiff's factual allegations were "not well-pleaded[,]" their conclusory nature "disentitles them to the presumption of truth") (quotation omitted).  Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678–79.

# I.    Section 1304.62 of the Ohio Revised Code (U.C.C. § 4A-207)

Plaintiff brings a claim under Section 1304.62 of the Ohio Revised Code, which codifies Section 4A-207 of the Uniform Commercial Code, against both PNC Bank and Citibank.

## I.A.    PNC Bank and Actual Knowledge (Section 1304.62(B))

Subsection (B) of the statute governs the circumstance in which wire-transfer instructions contain a mismatch between the name and account number of the intended beneficiary.  "[I]f the beneficiary's bank does not know that the name and [account] number refer to different persons, it may rely on the [account] number as the proper identification of the beneficiary of the order" and the "beneficiary's bank

6

need not determine whether the name and number refer to the same person." Ohio Rev. Code § 1304.62(B)(1).  Under this section, knowledge means "actual knowledge." *Id.* § 1301.202(B).  Therefore, when relying on the account number as the proper means of identification, there must be "actual knowledge" of the mismatch.  *Id.*; *see Kent Grp. Partners, LLC v. Citizens Bank, NA*, No. 23-3743, 2024 WL 945239. at *1 (6th Cir. 2024) (explaining that a plaintiff must "prove[] that the bank had 'actual knowledge' of the discrepancy in the [wire] instructions").

Plaintiff does not dispute that PNC Bank could have relied on the account number in the wire instructions as proper means of identification of the beneficiary. (ECF No. 15, PageID #110–11.)  Instead, Plaintiff argues that PNC Bank had actual knowledge of the mismatch in this case.  (*Id.*, PageID #111–15.)  PNC Bank argues that Plaintiff did not plead, and it did not have, actual knowledge of a mismatch between the beneficiary's name and account number.  (ECF No. 10-1, PageID #67–70.)

Here, the complaint alleges that Citibank wired $1 million to PNC Bank, which required the beneficiary's name and address (Nyriad Inc. with an address in Murphys, California) and an account number (with PNC Bank ending in 6837).  (ECF No. 1, ¶ 18, PageID #6.)  As it turns out, Nyriad did not open the account with PNC Bank in Lake County, Ohio.  (*Id.* ¶ 19.)  Then, the complaint describes Know Your Customer guidelines, written customer identification programs, and the documents and steps PNC Bank takes to verify the identity of an account holder.  (*Id.*, ¶¶ 21–23, PageID #7–8.)  Plaintiff alleges that an imposter, working as part of a larger criminal

7

organization, opened the account ending in 6837 at PNC Bank "via a PNC employee or employees." (*Id.*, ¶ 24, PageID # 8.)  When it comes to PNC Bank's actual knowledge of the mismatch or the opening of the fraudulent account, the complaint pleads in the alternative that the account was opened in a name other than Nyriad Inc. or fraudulently opened in that name:

> Based on information and belief, the Imposter Account was either (a) opened in a name other than Nyriad Inc. (i.e., a name different from the name in Plaintiff's wire instructions); or (b) was fraudulently opened in the name of "Nyriad Inc." (i.e., fraud that would have been caught had PNC used reasonable diligence in opening the account).

(*Id.*, ¶ 25.)  From there, the complaint alleges facts from which PNC Bank should have known of the mismatch.  For example, the complaint alleges that Nyriad Inc. did not exist with the Ohio Secretary of State and that PNC Bank did not follow its internal procedures for verifying new accounts.  (*Id.*, ¶¶ 26 & 30, PageID #8–9.)  But these sorts of "should have known" allegations do not meet the statutory prerequisite for actual knowledge.  *See Kent Grp. Partners*, 2024 WL 945239. at *1.

Where the complaint comes closest to pleading actual knowledge is the allegation that transactions in and out of the imposter account, including the $1 million wire transfer at issue, did not match the account's anticipated transaction type and value, resulting in automated notice to employees at PNC Bank.  (*Id.*, ¶¶ 32–33 & 35, PageID #10.)  Though closer to actual knowledge, here too the complaint fails to state a claim under the statute.  These allegations stop just short of claiming that PNC Bank had actual knowledge.  Even on information and believe, the complaint makes clear that PNC Bank "identified (or should have identified)" the account at issue as suspicious and had knowledge of the "fraud risk."  (*Id.*, ¶¶ 40 &

8

41, PageID #12.)  Risk, suspicion, and the exercise of due diligence easily plead that PNC Bank should have known of a mismatch with the wire transfer.  But the statute requires more.

Section 4A-207 accounts for the reality that wire transfers are conducted "by automated means" without "human reading" or intervention.  U.C.C. § 4A-207, cmt. 2 (Am. L. Inst. & Unif. L. Comm'n 2022).  Because PNC's process for wire transfers, including verification of information, is automated, and there is no allegation that any flagging of the transaction as suspicious resulted in actual knowledge, the complaint fails to state a claim against PNC Bank.  Allegations that PNC Bank should have known about the mismatch do not suffice.  *See Kent Grp. Partners*, 2024 WL 945239, at *1.  Accordingly, because Plaintiff has not alleged actual knowledge, PNC Bank cannot be liable under Section 1304.62.

### I.B.    Citibank, the Originating Bank, and Privity

Defendant Citibank seeks dismissal of the sole claim against it for violation of Section 1304.62(C) of the Ohio Revised Code.  This statute concerns the relationship between the "originator" of a funds transfer and, if the originator is not a bank, then the "originator's bank."  Ohio Rev. Code § 1304.62(C).  An "originator" means "the sender of the first payment order in a funds transfer."  *Id.* § 1304.51(A)(11).  The parties do not dispute that Mr. Marks is considered the originator of the funds transfer.  (ECF No. 17, PageID #150; ECF No. 19, PageID #182.)

Instead, the parties dispute whether Citibank was the originator's bank. Citibank argues that it cannot be liable because it was "merely an intermediary bank" in the wire transfer process that Mr. Marks initiated.  (ECF No. 17, PageID #150.)

On the other hand, Plaintiff maintains that Citibank was the originator's bank operating on behalf of the Bank of New Zealand.  (ECF No. 19, PageID #178–79 & #182–86.)

### I.B.1. Originating Bank Versus Intermediary Bank

Under Section 1304, an "originator's bank" means the "receiving bank to which the payment order of the originator is issued if the originator is not a bank."  Ohio Rev. Code § 1304.51(A)(12).  An "intermediary bank" means a "receiving bank other than the originator's bank or the beneficiary's bank."  *Id.* § 1304.51(A)(10).  Both an originating bank and an intermediary bank can participate in a funds transfer, which is the series of transactions involved in wiring money.  The originator issues a "payment order . . . for the purpose of making payment to the beneficiary of the payment order."  *Id.* § 1304.51(A)(6).  The payment order is "issued by the originator's bank or an intermediary bank" with the intention "to carry out the originator's payment order."  *Id.*  The transfer is "completed by acceptance by the beneficiary's bank."  *Id.*

At this stage of the proceedings, based on the complaint construed in Plaintiff's favor, Citibank may qualify as the originator's bank.  Plaintiff alleges that Citibank operated as an extension of the Bank of New Zealand for international transactions such as the one at issue here.  "BNZ, a New Zealand bank, partnered with Citibank for U.S.-domestic wire transfers . . . .  Citibank held BNZ funds in the U.S. and operated on behalf of BNZ, essentially serving as a U.S.-based branch for this purpose."  (ECF No. 1, ¶ 16, PageID #5.)  In that case, Citibank effectively stepped into the shoes of the Bank of New Zealand and served as the originator's bank for

purposes of the international transaction at issue. Also, Citibank's behavior after Plaintiff learned that the transfer went to a fraudulent account, supports considering Citibank the originating bank. Specifically, Citibank issued the "recovery request" to PNC Bank to recover the fraudulent wire transfer and directed the Bank of New Zealand to send it an indemnity to release the recovered funds. (*Id.*, ¶ 52, PageID #14.) And Citibank directed Plaintiff to handle the matter directly with the imposter. (*Id.*, ¶ 54.) Accepting these allegations as true, as the Court must, Plaintiff pleads that Citibank may qualify as the originator's bank under Section 1304.62(C).

### I.B.2. Privity

Although there is no dispute that there is privity between an originator and the originator's bank (ECF No. 17, PageID #150; ECF No. 19, PageID #185–86), Citibank maintains that the statute requires privity to bring a claim and argues that it cannot be in privity with Mr. Marks because it was not the originator's bank (ECF No. 17, PageID #146). Citibank incorporates by reference PNC Bank's arguments on privity. (*Id.*, PageID #151 (citing ECF No. 10; ECF No. 16).) PNC Bank includes a block drawing depicting both the Bank of New Zealand and Citibank as the "Originator's Bank," which received Plaintiff's payment order and sent payment to PNC Bank as the beneficiary bank. (ECF No. 10-1, PageID #71.) This summary contradicts Citibank's argument that it was not the originator's bank.

When determining privity, Ohio courts have "applied a broad definition to determine whether the relationship between the parties is close enough to invoke the doctrine." *State ex rel. Schachter v. Ohio Pub. Emps. Ret. Bd.*, 121 Ohio St. 3d 526, 2009-Ohio-1704, 905 N.E.2d 1210, ¶ 33 (citations omitted). Privity exists where there

is a "mutuality of interest, including an identity of desired result." *Kirkhart v. Keiper*, 101 Ohio St. 3d 377, 2004-Ohio-1496, 805 N.E.2d 1089, ¶ 8 (quoting *Brown v. Dayton*, 89 Ohio St. 3d 245, 248, 2000-Ohio-148, 730 N.E.2d 958). In determining whether there is privity, a court "must look behind the nominal parties to the substance of the cause to determine the real parties at interest." *Fort Fry Teachers Ass'n, OEA/NEA v. State Emp. Rels. Bd.*, 81 Ohio St. 3d 392, 396, 1998-Ohio-435, 692 N.E.2d 140.

Based on the pleadings, the Court cannot determine whether Citibank was the originator's bank because such a determination depends on the facts and circumstances of the relationship at issue, which will be developed through discovery. Accordingly, the ultimate determination whether Citibank is the originator's bank in this transaction requires the development of the record and will allow for a more fulsome presentation of the issue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). At that point, Plaintiff will no longer be able to rely on his allegations and will have to come forward with evidence of "specific facts" to support its argument that Citibank served as the originator's bank within the meaning of the statute—rather than being an "intermediary bank" that merely facilitated the transaction. *Id.*

## II.  Negligence

To state a claim for negligence under Ohio law, a plaintiff must show that a defendant (1) owed him a duty, (2) breached that duty, and (3) that breach proximately caused an injury to the plaintiff. *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142, 539 N.E.2d 614 (1989). Liability for negligence arises only where "one fails to discharge an existing duty." *Id.* Further, a plaintiff must be foreseeably "within the

circle of those to whom injury may reasonably be anticipated" to show that a defendant owed the plaintiff a duty of care. *Id.* In other words, the plaintiff must allege that the defendant could have reasonably foreseen that its actions could cause harm to the plaintiff or someone like him. *Id.* at 143.

In analyzing claims for negligence, courts consider whether the defendant should have foreseen the risk of injury to the plaintiff. *Id.* This analysis largely depends on the defendant's knowledge. *Menifee v. Ohio Welding Prods.*, 15 Ohio St. 3d 75, 77, 472 N.E.2d 707 (1984). Courts consider only facts that a defendant "perceived, or should have perceived, at the time" of its action in determining its level of knowledge and, therefore, its duty to a plaintiff. *Id.*

"The almost-universal law in this country is that banks owe a duty of care only to their own customers." *SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 357 (6th Cir. 2014). Ohio follows that prevailing rule. *Spitzer Mgmt., Inc. v. Interactive Brokers, LLC*, No. 1:13-cv-2184, 2013 WL 6827945, at *4 (N.D. Ohio Dec. 20, 2013); *Driessen v. Woodforest Nat'l Bank*, 940 F. Supp. 2d 584, 591 (S.D. Ohio 2013).

Plaintiff asserts that PNC Bank owed a duty of care in the State in which the imposter account was opened. (ECF No. 1, ¶ 76, PageID #18.) While PNC Bank acknowledges that banks owe a duty of care to their customers, it argues that because Plaintiff was not its customer, the negligence claim fails as a matter of law. (ECF No. 10, PageID #74.)

Receiving funds through a wire transfer does not create a relationship that gives rise to a duty of care. PNC Bank's involvement was limited to processing a

13

transaction received from Citibank with instructions from Mr. Marks.  There was no communication or contractual agreement between Mr. Marks and PNC Bank. Because Mr. Marks did not have a contractual relationship with PNC Bank, and because all communication with PNC Bank came through Citibank as an intermediary, PNC Bank did not owe a duty of care to Mr. Marks.

Even if PNC Bank owed Mr. Marks a duty, the negligence claim still fails as a matter of law because the Bank Secrecy Act, which encompasses the federal Know Your Customer guidelines and the requirements for a customer identification program, does not aim to protect individuals.  *See* 31 U.S.C. § 5311.  Instead, under the Act, "a defendant's only liability is to the government, and, in particular, to the Secretary of the Treasury."  *Martinez Colon v. Santander Nat'l Bank*, 4 F. Supp. 2d 53, 57 (D.P.R. 1998).  Therefore, PNC Bank has no duty or liability to Plaintiff as an individual.  Accordingly, Plaintiff fails to state a claim for negligence.

## III.  Conversion

Conversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner or withholding it from the owner's possession under a claim inconsistent with his rights.  *State ex rel. Toma v. Corrigan*, 92 Ohio St. 3d 589, 2001-Ohio-1289, 752 N.E.2d 281, 285 (2001).  Further, "it is now generally held that intangible rights which are customarily merged in or identified with some document may also be converted.  Examples include bank passbooks, deeds, and drafts." *Zacchini v. Scripps-Howard Broad. Co.*, 47 Ohio St. 2d 224, 351 N.E.2d 454, 457 (1976).

For a conversion claim, a plaintiff must plead:  "(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *6750 BMS, L.L.C. v. Drentlau*, 2016-Ohio-1385, 62 N.E.3d 928, 934 (2016). "Wrongful purpose or intent is not a necessary element of conversion; thus, a defendant is liable even if he is acting under a misapprehension or mistake.  The only intent required is the intent to exercise dominion or control over the property." *Vienna Beauty Prods. Co. v. Cook*, 2015-Ohio-5017, 53 N.E.3d 808, 813 (2015).

Plaintiff alleges that PNC Bank wrongfully held Plaintiff's funds and prevented his right to possession, and that Plaintiff did not authorize PNC Bank's assumption of control over his funds.  (ECF No. 1, ¶¶ 90–91, PageID #20.)    PNC Bank argues that the Uniform Commercial Code, as enacted in Ohio, preempts the claim.  (ECF No. 10-1, PageID #76–78.)

Both parties agree that Uniform Commercial Code governs the wire transfer itself.  They dispute whether Article 4A preempts Plaintiff's conversion claim with respect to PNC Bank's conduct after the wire transfer.  Ohio courts have consistently held that the Uniform Commercial Code governs disputes that involve bank transactions to the exclusion of common-law claims, including conversion.  *See Amzee Corp. v. Comerica Bank-Midwest*, 2002-Ohio-3084, ¶¶ 47–49 (Ohio Ct. App.); *see also Peters Family Farm, Inc. v. Sav. Bank*, 2011-Ohio-665, ¶ 19 (Ohio Ct. App.).

Here, PNC Bank's alleged wrongful holding of Plaintiff's funds ties directly to the fraudulent wire transfer.  And Plaintiff bases his conversion claim on PNC Bank's

role as the beneficiary bank in receiving and transferring the funds to the imposter account. But the Uniform Commercial Code, and Article 4A in particular, governs these kinds of actions. Therefore, the Uniform Commercial Code preempts Plaintiff's claim for conversion.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant PNC Bank's motion to dismiss (ECF No. 10) and **DENIES** Defendant Citibank's motion to dismiss (ECF No. 17).

**SO ORDERED.**

Dated: February 24, 2026

_____

J. Philip Calabrese
United States District Judge
Northern District of Ohio

16